79 F.3d 285
 44 Fed. R. Evid. Serv. 217
 Christopher HYNES, Plaintiff-Appellant,
v.
Thomas A. COUGHLIN, III, Robert J. McClellan, Charles
Scully, George Duncan, C.O. Cobb and C.O. Shope, Defendants,
Bobbie Jo Laboy, Sergeant, John Zemken, Corrections Officer,
Michael Rhynders, Corrections Officer, Edward
Doyle, Corrections Officer, Michael
Capra, Corrections Officer,
Defendants-Appellees.
 No. 795, Docket 95-2391.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 18, 1995.
Decided March 21, 1996.
 
 Matthew L. Guadagno, New York City (William D. Gibney, Prisoners' Legal Services, New York City, on the brief), for Plaintiff-Appellant.
 Jeanne Lahiff, Assistant Attorney General, New York City (Dennis C. Vacco, Attorney General of the State of New York, Charles F. Sanders, Thomas Hanna, Assistant Attorneys General, and Richard Teer, Law Intern, New York City, on the brief), for Defendants-Appellees.
 Before KEARSE, MINER, and PARKER, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiff Christopher Hynes, a New York State prisoner, appeals from so much of a judgment entered in the United States District Court for the Southern District of New York, following a jury trial before Robert W. Sweet, Judge, as (a) dismissed his claims under 42 U.S.C. § 1983 (1994) for damages from defendants-appellees, who were guards at the Green Haven Correctional Facility ("Green Haven"), for unreasonable use of force in retaliation for Hynes's complaints about prison conditions, and (b) awarded defendant-appellee John Zemken $1,500 on his counterclaim against Hynes for battery. On appeal, Hynes contends principally that the district court erred in permitting appellees to introduce evidence of his prison disciplinary record. For the reasons that follow, we agree, and we vacate the judgment in part and remand for a new trial of Hynes's claims against appellees and of Zemken's counterclaim against Hynes.
 
 I. BACKGROUND
 
 2
 The present litigation, brought by Hynes against prison guards for allegedly malicious and sadistic use of force, centered on two incidents. The first occurred on May 30, 1991, when Hynes, then incarcerated in the Southport Correctional Facility, became involved in a physical altercation with defendants C.O. Cobb and C.O. Shope (the "Southport incident"). The second occurred on July 3, 1991, when Hynes was incarcerated at Green Haven and became involved in a physical altercation with Zemken and the other appellees (the "Green Haven incident"). The facts of the Southport incident are no longer at issue; the jury awarded Hynes $1,250 on his claim against Cobb and Shope with respect to that incident, and neither side has appealed from so much of the judgment as reflects the verdict in favor of Hynes.
 
 A. The Green Haven Incident
 
 3
 Certain aspects of the Green Haven incident are not in dispute. On July 3, after Hynes had been placed in ankle shackles, a waist chain, and handcuffs, Zemken escorted him from his cell to a shower area where the other appellees were on guard duty. When Zemken removed Hynes's restraints, Zemken and Hynes became engaged in a physical altercation. The other appellees then wrestled with Hynes until they managed to replace his physical restraints. Hynes was left with an injured eye and bruises requiring medical treatment.
 
 
 4
 The principal disputed question at trial was who initiated the fight. Appellees presented testimony that the instigator was Hynes: Zemken testified that he escorted Hynes to the shower and placed him in the doorway, and that as Zemken was removing the last handcuff, Hynes, without any provocation, kicked Zemken in the testicles. Zemken testified that as he fell forward he was further attacked by Hynes who continued to fight violently, resisting attempts by the other appellees to restrain him and rescue Zemken. Hynes, in contrast, testified that he never kicked Zemken; that Zemken was the instigator; that after Zemken unshackled him, Zemken rushed him, tackled him, and fell on top of him. Hynes testified that Zemken and the other appellees twisted his arms and legs, pulled his hair, smashed his face on the floor, and punched him several times about the head and face.
 
 
 5
 B. The Evidence of Hynes's Disciplinary Record
 
 
 6
 Just prior to the commencement of trial, Hynes made a motion in limine to exclude evidence of, inter alia, his prison disciplinary records. Defendants, who proposed to offer 15 such records, opposed the motion, arguing principally that the past records were relevant to show, by reference to his "character," that Hynes "[wa]s not an innocent party":MR. LIBERMAN [attorney for defendants]:.... [T]he defendants' position is that the information is relevant as to plaintiff's credibility and his character. He's going to testify--
 
 
 7
 THE COURT: Well, you're wrong, aren't you? I mean, Honest Injun, you're wrong?
 
 
 8
 MR. LIBERMAN: No, we don't think so.
 
 
 9
 THE COURT: What are you talking about?
 
 
 10
 MR. LIBERMAN: We are not talking about a propensity for violence.
 
 
 11
 THE COURT:.... [I]t's just a question of relevance, isn't it?
 
 
 12
 MR. LIBERMAN: We believe it is relevant to the assaultive nature of his character. In addition, he's going to testify that both of these incidents were unprovoked, he was an innocent party, and we believe it is relevant to establish his character, that he is not an innocent party, under Rules 404(a) and 405(b).
 
 
 13
 THE COURT: It is really who struck John, isn't it?
 
 
 14
 MR. LIBERMAN: The bottom-line decision of the case?
 
 
 15
 THE COURT: Who struck John, who started the fight?
 
 
 16
 MR. LIBERMAN: Ultimately it will be. The plaintiff is going to testify both incidents were unprovoked assaults on him, he is an innocent party who had done nothing.
 
 
 17
 THE COURT: Yes, but your position is that in terms of his intent, it was his intent to provoke the assault or start the assault?
 
 
 18
 MR. LIBERMAN: Yes....
 
 
 19
 (Pretrial Transcript ("Pretrial Tr.") 7-9.)
 
 
 20
 The district court excluded 10 of the disciplinary records but ruled five such records conditionally admissible, "assuming that the ... plaintiff testifies that he had no intent to provoke an incident." (Pretrial Tr. 11-12.)
 
 
 21
 At trial, Hynes's counsel, in his opening statement, presented Hynes's version of events. He stated that Hynes would testify that he did not start the physical altercation and that defendants had assaulted him in retaliation for speaking up to assert his rights and the rights of his fellow prisoners. Defense counsel's opening statement, in contrast, stated that defendants would show that Hynes initiated the altercation and that he had a history of violent behavior. Defense counsel argued that the jury should therefore reject Hynes's version of the events as incredible:
 
 
 22
 [Hynes] is in prison because he killed a person, and this fact and what you will also hear about various disciplinary infractions that he has committed while in prison are things for you to consider when you assess his credibility.
 
 
 23
 [Hynes] will testify that both of these altercations were entirely unprovoked, that he was entirely innocent.... He will also testify that [appellees] attacked him for no reason. That's not the case.
 
 
 24
 You will need to consider who this man is in assessing whether or not this claim of his that he is entirely innocent is something that should be believed.
 
 
 25
 (Trial Transcript ("Tr.") 25.)
 
 
 26
 During defendants' cross-examination of Hynes, the five disciplinary records were admitted over Hynes' objections on the grounds of, inter alia, relevance and undue prejudice. The records revealed that Hynes had been charged with and disciplined for, inter alia, threatening a commanding officer, threatening and assaulting staff, and harassing and threatening corrections officers. In the process of laying a foundation for each record's admission, defense counsel asked numerous questions about the events reflected in the records, including the following:
 
 
 27
 "Mr. Hynes, isn't it true on February 19th of 1991, you threatened a correction [sic ] officer?"
 
 
 28
 "Isn't it true that you said to Officer Farrell, 'Come out of that bubble, motherfucker, and I'll kick your homo ass'?"
 
 
 29
 "Isn't it also true you then said to him, 'Come out of that bubble, and I'll do to you what I did to get in this motherfucker of an asshole prison'?"
 
 
 30
 "Isn't it true that you were found guilty of the charges here?"
 
 
 31
 (Tr. 148-49.)
 
 
 32
 "Isn't it true that after Officer White gave you a direct order, you became very abusive and refused to comply with his order?"
 
 
 33
 "Isn't it true that ... you were found guilty [of this charge]?"
 
 
 34
 (Tr. 151.)
 
 
 35
 "... [D]o you recall being charged in an incident ... in which you were charged with threats, assault on staff, rioting, including a penal offense?"
 
 
 36
 "Isn't it true you attempted to cut a correction [sic ] officer with a .... piece of lead?"
 
 
 37
 "Isn't it true you were found guilty of each of the offenses?"
 
 
 38
 "Isn't it true that you were sentenced to one year in Special Housing Unit as a result of these charges?"
 
 
 39
 (Tr. 153-54.)
 
 
 40
 In summation, defense counsel again drew the jury's attention to Hynes's disciplinary records and his history of violence:
 
 
 41
 First of all, if there is a theme to this trial, I would like it to be this: Looks are deceiving. That's right. Just think about it. Looks are deceiving.
 
 
 42
 [Hynes's attorneys] want you to look at Mr. Hynes in a certain way[.] [He sits] between them in a nice gray suit and tie. They call him Chris. And he's short, of slight build, and to look at him, if you hadn't heard all the testimony throughout this trial, you might think of him as an altar boy, or just as any average person you might pass on the street.
 
 
 43
 But Mr. Hynes is known as something other than Chris. He's also known as Department of Correctional Services inmate number 88 A 1221. And that's because he was convicted of the crimes of murder in the second degree, and attempted robbery in the first degree. And, he also testified to having three separate robbery convictions.
 
 
 44
 And that's not all. Once in prison, Mr. Hynes still could not conform to the rules and regulations of the Department of Correctional Services, and he's also serving a sentence for attempting to promote prison contraband.
 
 
 45
 There is more. Mr. Hynes continued on a course of threatening and abusive behavior towards corrections staff, and has been charged on numerous occasions with failing to follow a direct order. He has such a record that he was transferred to Southport, which, you've heard testimony about, was the facility in 1991 that was used to house the worst of the worst in the Department of Correctional Services.
 
 
 46
 Yes, I submit to you that looks are deceiving....
 
 
 47
 ....
 
 
 48
 When you deliberate, look at ... the inmate misbehavior reports in evidence that Mr. Hynes received for his behavior once incarcerated....
 
 
 49
 Mr. Hynes is not a peaceful person....
 
 
 50
 Now, one of the critical issues for you to decide while you deliberate is who to believe and who not to believe when you assess Mr. Hynes' claim that he was ... the victim of innocent [sic ], unprovoked assaults, and defendants' argument, instead, that Mr. Hynes provoked the incident and was the instigator.
 
 
 51
 During the course of this trial you've heard the testimony about Mr. Hynes' behavior and about the disciplinary proceedings in which he was found guilty. Defendants offer this evidence not to prove that Mr. Hynes has a propensity for committing acts of violence, but rather so you can assess his credibility and character and determine whether the actions that inmate Hynes presented to you in this courtroom are a sham.
 
 
 52
 (Tr. 1043-46.)
 
 
 53
 In charging the jury, the court recapitulated the parties' versions as to who had initiated the altercations and indicated that the pivotal issue was credibility: "it's a simple case, but it's a hard case" (Tr. 1123); "there is an obvious and direct conflict between the versions of the parties and you have the task of deciding which of those you are going to believe" (Tr. 1163).
 
 C. The Verdicts and the Posttrial Rulings
 
 54
 The jury was given a special verdict form, requiring it to answer questions with respect to each defendant on each incident. The jury found, inter alia, that in the Southport incident, Cobb and Shope had used force against Hynes maliciously, unreasonably, and sadistically to cause him harm, rather than in a good faith effort to maintain or restore discipline, and had thereby caused him injury. It awarded Hynes $1,250 against those defendants as compensatory damages for pain and suffering but denied him any punitive damages.
 
 
 55
 As to the Green Haven incident, the jury exonerated all of the appellees. The jury found, inter alia, that Zemken, along with three other appellees, had used force against Hynes and caused him injury; but it found that they had not applied force maliciously or sadistically or in retaliation for Hynes's complaints about prison conditions. The jury found that Hynes had committed battery against Zemken, for which it awarded Zemken $1,500 for pain and suffering.
 
 
 56
 After the jury returned its verdicts, Hynes moved for a new trial, arguing that the verdicts in favor of appellees were against the great weight of the evidence. Cobb and Shope moved for a new trial on the ground, inter alia, that the court should have admitted all of Hynes's disciplinary records, not just five. In an opinion dated May 30, 1995 ("District Court Opinion"), the district court denied Hynes's motion on the ground that the verdicts were supported by the jury's apparent determinations of credibility as to who had instigated the Green Haven incident.
 
 
 57
 The court also denied the motion of Cobb and Shope, adhering to its original determination that the exclusion of 10 of the proffered disciplinary records was appropriate. The court explained, inter alia, that Hynes "did not claim to have had any 'accidental' contact with the defendants from either the Southport or Green Haven incident," District Court Opinion at 26, and it rejected the contention that the excluded records should have been admitted to show intent or absence of mistake.
 
 
 58
 Hynes has appealed; Cobb and Shope have not cross-appealed.
 
 II. DISCUSSION
 
 59
 On appeal, Hynes contends principally that he is entitled to a new trial on the claims relating to the Green Haven incident because the district court abused its discretion in allowing his disciplinary records into evidence. We agree.
 
 A. Admission of the Disciplinary Records
 
 60
 Evidence of other acts is not admissible to prove that the actor had a certain character trait, in order to show that on a particular occasion he acted in conformity with that trait. Rule 404 provides that, with certain exceptions not pertinent here, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion," Fed.R.Evid. 404(a), and that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," Fed.R.Evid. 404(b).
 
 
 61
 Rule 404(b) does, however, provide that other crimes, wrongs, or acts "may ... be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id.; see also Huddleston v. United States, 485 U.S. 681, 687-88, 108 S.Ct. 1496, 1500-01, 99 L.Ed.2d 771 (1988); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir.1992). But see Fed.R.Evid. 403 (even relevant evidence may be excluded on the ground, inter alia, that its probative value is substantially outweighed by its potential for unfair prejudice); United States v. Levy, 731 F.2d 997, 1002 (2d Cir.1984).
 
 
 62
 Where intent is in issue, evidence of other acts that bear on intent is properly admissible under Rule 404(b). For example, in a civil rights suit brought by a prison inmate, where the plaintiff testifies that he struck a corrections officer reflexively and by accident, the trial court may properly admit evidence of the plaintiff's prison disciplinary record of assaults to show the absence of mistake. See Young v. Rabideau 821 F.2d 373, 376-80 (7th Cir.1987), cert. denied, 484 U.S. 915, 108 S.Ct. 263, 98 L.Ed.2d 221 (1987). In contrast, where there is no tenable basis for contending that there was an issue such as intent or knowledge, it is error to admit an inmate's disciplinary record to support the inference that he had a "penchant for violent conduct." Lataille v. Ponte, 754 F.2d 33, 36 (1st Cir.1985) (internal quotation marks omitted).
 
 
 63
 We review the court's admission of evidence under Rule 404(b) for abuse of discretion. See, e.g., United States v. Peterson, 808 F.2d 969, 974 (2d Cir.1987). If we find that the trial court abused its discretion, we will order a new trial unless we conclude that the error was harmless. See, e.g., Fed.R.Civ.P. 61 (error is not ground for reversal unless affirmance would be "inconsistent with substantial justice"). Such an error is harmless if the appellate court can conclude with fair assurance that the improperly admitted evidence did not substantially influence the jury. See, e.g., Kotteakos v. United States, 328 U.S. 750, 764-65, 66 S.Ct. 1239, 1247-48, 90 L.Ed. 1557 (1946); Phoenix Associates III v. Stone, 60 F.3d 95, 105 (2d Cir.1995); United States v. Pedroza, 750 F.2d 187, 197 (2d Cir.1984); United States v. Check, 582 F.2d 668, 684 (2d Cir.1978). "To say that the erroneously admitted testimony did not substantially influence the jury we are not required to conclude that it could not have had any effect whatever; the error is harmless if we can conclude that that testimony was 'unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " United States v. Rea, 958 F.2d 1206, 1220 (2d Cir.1992) (quoting Yates v. Evatt, 500 U.S. 391, 403, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991)). One indicator of the evidence's degree of importance is whether or not the evidence bears on an issue that is plainly critical to the jury's decision. See, e.g., United States v. Pagan, 721 F.2d 24, 31 (2d Cir.1983) (when accused's credibility was critical issue, erroneous admission of evidence to impeach accused's credibility was not harmless error). Another barometer is whether or not the evidence was emphasized in arguments to the jury. See, e.g., Chapman v. California, 386 U.S. 18, 25, 87 S.Ct. 824, 828-29, 17 L.Ed.2d 705 (1967) (comment on defendants' failure to testify could not be deemed harmless where "prosecutor's argument and the trial judge's instruction to the jury continuously and repeatedly impressed the jury that [the jury could draw inferences of guilt] from the failure of petitioners to testify"); United States v. Peterson, 808 F.2d at 976 (prosecutor's dwelling on erroneously admitted evidence suggests error was not harmless); United States v. Ruffin, 575 F.2d 346, 359-60 (2d Cir.1978) (same).
 
 
 64
 On appeal in the present case, appellees argue that the evidence of Hynes's prison disciplinary record was properly admitted to show (a) Hynes's intent or lack of accident in initiating the Green Haven incident, or (b) the reasonableness of appellees' conduct, or (c) a pattern of conduct on the part of Hynes. None of these justifications survives scrutiny of the record. First, although the trial court had ruled at the pretrial hearing that evidence of Hynes's disciplinary history would be admitted if Hynes put his intent at issue, Hynes did not put his intent at issue. He did not testify that he kicked Zemken by accident; rather, he denied kicking Zemken at all. Thus, in charging the jury, the trial court stated, "As you've heard, Zemken claims that Hynes kicked him in the groin causing him great pain. Hynes denies the act, denies kicking him." (Tr. 1138.) A dispute as to whether or not a party performed a particular physical act is not an issue as to intent. As the district court properly noted in its posttrial rejection of the motions of Cobb and Shope for a new trial at which all of Hynes's disciplinary records would be admitted, Hynes "did not claim to have had any 'accidental' contact with the defendants." District Court Opinion at 26. Second, appellees' contention that Hynes's disciplinary record was relevant to show the reasonableness of their actions is insupportable because they did not present evidence that, at the pertinent time, they were aware of Hynes's disciplinary record. Indeed, in opposing Hynes's in limine motion to exclude those records, defense counsel stated expressly that he was "not suggesting that the information should come in because [appellees] knew about it." (Pretrial Tr. 7.) Finally, the contention that Hynes's disciplinary record was relevant to show a pattern of conduct is misplaced, for the proper purpose of pattern evidence is principally to show the identity of the perpetrator or the absence of accident or mistake. See generally J. Strong, McCormick on Evidence § 190, at 801 (4th ed. 1992). As indicated above, there was no issue here of intent. And there plainly was no question as to Hynes's identity.
 
 
 65
 Nor does the record of the proceedings in the district court even remotely suggest that defendants intended to use Hynes's prison disciplinary history for the above purposes. Instead, the record is replete with defense statements revealing precisely and explicitly that the records were intended to show Hynes's "character" and to persuade the jury that because of that character, the jury should infer that Hynes was not an innocent party in these altercations. Though defendants at times cast the matter in terms of credibility, the acts that were the subject of the disciplinary charges did not involve Hynes's veracity. The records generally showed assaults and threats, and defendants expressed the intention to use them to show Hynes's "assaultive ... character":
 
 
 66
 We believe that it is relevant to the assaultive nature of his character. In addition, he's going to testify that both of these incidents were unprovoked, he was an innocent party, and we believe it is relevant to establish his character, that he is not an innocent party, under Rules 404(a) and 405(b).
 
 
 67
 (Pretrial Tr. 8. (emphasis added)); see also Memorandum of Law in Support of the Motion by Defendants Cobb and Shope for Judgment as a Matter of Law or, in the Alternative, for a New Trial, at 33 (reiterating that defendants had "sought to introduce [Hynes's] disciplinary record to show 'the assaultive nature of his character,' " and to show that he "frequently ... engages in ... verbally and physically abusive behavior, and in sporadic acts of violence").
 
 
 68
 In keeping with their arguments to the court as to how they meant to use Hynes's disciplinary record, defendants made the same arguments to the jury, emphasizing in their opening statement and in summation that the record showed that Hynes had a violent character. For example, in the opening, defense counsel noted that Hynes would testify that appellees had instigated the altercations without provocation from him, and that in order to "assess his credibility and character," the jury would hear that Hynes "is in prison because he killed a person," and "w[ould] also hear about various disciplinary infractions that he has committed while in prison." (Tr. 25.) Defense counsel exhorted the jury that, in deciding whether or not to believe that Hynes was "entirely innocent," it should "consider who this man is." (Id.)
 
 
 69
 In the summation, defense counsel reiterated, "you might think of him as an altar boy," but "he was convicted of ... murder"; "[a]nd that's not all. Once in prison,.... Mr. Hynes continued on a course of threatening and abusive behavior towards corrections staff.... He has such a record that he was transferred to Southport, ... the facility in 1991 that was used to house the worst of the worst...." (Tr. 1044.) Telling the jury that it must "assess his ... character" (Tr. 1046) in order to decide whether to believe Hynes's testimony that he was an innocent victim of unprovoked assaults, defense counsel said:
 
 
 70
 When you deliberate, look at ... the inmate misbehavior reports in evidence that Mr. Hynes received for his behavior once incarcerated....
 
 
 71
 Mr. Hynes is not a peaceful person.
 
 
 72
 (Tr. 1045.)
 
 
 73
 In sum, as the district court recognized, the key disputed issue at trial was who initiated the physical altercations. Though defendants stated that they were not offering Hynes's disciplinary records in order to show his "propensity" for violence (e.g., in summation, see Tr. 1046), their lip service to the proper principle cannot alter the fact that throughout the trial, defense counsel was explicit that the information in Hynes's disciplinary records was offered in order to show (1) that Hynes had an aggressive character, and (2) that it was therefore more likely than not that he was the aggressor on the occasions in question. The admission of the evidence for this purpose was improper under Rule 404.
 
 
 74
 We note that appellees evidently believe that Hynes's character was "an essential element of a charge, claim, or defense," Fed.R.Evid. 405(b), for on this appeal as in the district court they have cited Rule 405(b) as support for the proffered disciplinary records. Rule 405, however, deals only with the methods by which character may be proven once it has been determined that character evidence is admissible under Rule 404(a). See Fed.R.Evid. 405 1972 Advisory Note. Since the character evidence proffered here was not admissible under Rule 404, Rule 405(a) is inapplicable.
 
 
 75
 Finally, appellees suggest that any error in the admission of the records was harmless because the jury did not ask to see them during deliberations. Given defense counsel's relentless emphasis on this evidence in the opening statement, in cross-examining Hynes, and in summation, we cannot agree. The trial record excerpts quoted above reveal that defendants themselves plainly did not believe that Hynes's history of threats and violence was unimportant in relation to everything else the jury considered. We share that view of the evidence's impact, and though it is of course possible that the jury would have reached the same verdict had the evidence been excluded, we have no confidence whatever that the improperly admitted evidence did not substantially influence the jury.
 
 
 76
 We conclude that the use of Hynes's disciplinary history was inconsistent with substantial justice. Accordingly, we vacate so much of the judgment as was in favor of appellees, and we remand for a new trial at which that evidence is to be excluded.
 
 B. Hynes's Other Contentions
 
 77
 Hynes also contends that the trial court erred in excluding evidence of certain other acts of the appellees and in admitting hearsay statements reported on a "Use of Force" form purporting to describe the Green Haven incident. Since we are remanding for a new trial, we briefly address these contentions.
 
 1. Other Acts of Appellees
 
 78
 Hynes sought to cross-examine appellee Bobbie Jo LaBoy as to whether she had been "criticized and ... told [that she] needed to improve [her] patience with [her] fellow employees." (Tr. 746.) Defendants' objection to this question was properly sustained. It was well within the discretion of the trial court to exclude this evidence on the ground that LaBoy's treatment of fellow employees was not sufficiently relevant to her treatment of inmates. Further, to the extent that this evidence was proffered by Hynes to show that LaBoy "ha[d] a temperament problem" (Hynes brief on appeal at 21), it suffered the same flaw as the evidence improperly admitted against him, that is, it was meant to show a character trait in order to show that in the Green Haven incident LaBoy acted in conformity with that trait. We conclude that this evidence was properly excluded.
 
 
 79
 The exclusion of two inquiries during Hynes's cross-examination of appellee Edward Doyle presents a different question. Doyle was one of the two appellees who testified that they actually saw Hynes kick Zemken. Hynes asked:
 
 
 80
 "Now, isn't it true that ... you claimed an injury to your knee on the job which the Workmen's Compensation Board found to be .... not job related[?]"
 
 
 81
 and
 
 
 82
 "[I]sn't it true that in 1988, you were suspended for three months without pay for giving false information .... to a lieutenant?"
 
 
 83
 (Tr. 801, 802-03.) The trial judge sustained defendants' objections to these questions, apparently on the ground that neither question was "relevant to the issues presented." District Court Opinion at 31. Given that the case turned on the jury's evaluation of the various witnesses' credibility, we question the court's assessment as to relevance.
 
 
 84
 With respect to attacks on, or bolstering of, a witness's credibility, Rule 608 gives the trial court discretion to permit cross-examination (but not extrinsic evidence) as to "[s]pecific instances of [the witness's] conduct" if those instances will be "probative of [the witness's character for] truthfulness or untruthfulness." Fed.R.Evid. 608(b). See generally 28 Charles A. Wright & Victor J. Gold, Federal Practice and Procedure: Evidence 6117 (1993). Under this Rule, we have upheld, for example, cross-examination into an attorney's disbarment, see United States v. Weichert, 783 F.2d 23, 25 (2d Cir.) cert. denied, 479 U.S. 831, 107 S.Ct. 117, 93 L.Ed.2d 64 (1986), into a witness's failure to disclose a prior arrest on his bar application, see United States v. Schatzle, 901 F.2d 252, 255-56 (2d Cir.1990), and into a prior finding by an Immigration Judge that the witness's testimony in a deportation proceeding was not credible, see United States v. Bagaric, 706 F.2d 42, 65 (2d Cir.), cert. denied, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); see also United States v. Tomblin, 46 F.3d 1369, 1389 (5th Cir.1995) (upholding cross-examination into a defendant's alleged acts of fraud, bribery, and embezzlement).
 
 
 85
 While the questions that Hynes posed to Doyle did not relate to the events of this case, they did relate to Doyle's character for truthfulness. Assuming, therefore, that there was a good-faith basis for the questions, see, e.g., id. at 1389 n. 52 ("Rule 608(b) does require a good-faith basis for the questions."); United States v. Katsougrakis, 715 F.2d 769, 779 (2d Cir.1983), cert. denied, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984) ("when confronted with a demand for an offer of proof," questioner must "provide some good faith basis for questioning that alleges adverse facts"), the questions would arguably elicit relevant information. The trial judge has discretion under Rules 608(b) and 403 to determine whether that information, though relevant, should be excluded.
 
 2. The "Use of Force" Report
 
 86
 The trial court allowed appellees to introduce into evidence the "Use of Force" form (the "report") filled out by LaBoy with respect to the Green Haven incident. The report purported to describe the beginning of the altercation, stating in pertinent part that "[w]hile removing mechanical restraints for shower participation, Hynes kicked Officer Zemken with right foot in groin area." LaBoy testified, however, that she herself had not seen any part of the incident until she heard a scream and "observed Officer Zemken holding his genital area and falling inward into the shower." (Tr. 696.) Hynes therefore objected to the introduction of the report on the ground that it contained hearsay. His objection was overruled. Appellees argue that the ruling was correct because the report was admissible under one or more exceptions to the hearsay rule, to wit, as a present-sense impression, see Fed.R.Evid. 803(1), or as past recollection recorded, see Fed.R.Evid. 803(5), or as a public record, see Fed.R.Evid. 803(8), or as a business record, see Fed.R.Evid. 803(6). The trial record suggests that only the last ground may have been available.
 
 
 87
 The present-sense impression exception applies only to a statement, describing an event, that was "made while the declarant was perceiving the event ... or immediately thereafter." Fed.R.Evid. 803(1). The exception for past recollection recorded is similarly available only with respect to "a matter about which [the] witness once had knowledge." Fed.R.Evid. 803(5). Both of these exceptions are inapplicable because, inter alia, LaBoy did not see the start of the Green Haven incident. Further, even had she seen it, there was no indication that the report was made at, or immediately after, the time of the event as is required for admission as a present-sense impression. See Fed.R.Evid. 803(1) 1972 Advisory Note (this exception requires "substantial contemporaneity of event and statement"); Hilyer v. Howat Concrete Co., 578 F.2d 422, 426 n. 7 (D.C.Cir.1978) (delay of 15 to 45 minutes "hardly qualifies as 'immediately' "). Nor was an adequate foundation laid for receipt of the report as a public record pursuant to Fed.R.Evid. 803(8) (report may be admitted if it sets forth "matters observed pursuant to duty imposed by law as to which matters there was a duty to report"); cf. id. 1972 Advisory Note ("Police reports have generally been excluded except to the extent to which they incorporate first-hand observations of the officer.").
 
 
 88
 The most plausible hearsay exception would seem to have been that for business records, provided by Fed.R.Evid. 803(6). A partial foundation was perhaps laid for introduction of the report under that exception, in that Green Haven apparently had a standard "Use of Force" form, and LaBoy testified that "[a]ny time that force is used on an inmate to control the situation, this form has to be filled out and it states what incidents led up to the use of force and what exactly each and every person involved in the use of force did." (Tr. 700.) But see Palmer v. Hoffman, 318 U.S. 109, 114, 63 S.Ct. 477, 480-81, 87 L.Ed. 645 (1943) (record must be kept primarily for "the systematic conduct of the enterprise as a ... business," rather than for the purpose of litigation or limiting liability); Fed.R.Evid. 803(6) 1972 Advisory Note (approving reasoning of Palmer v. Hoffman ). Further, although as to the part of the report that described the beginning of the altercation, LaBoy, who prepared the report, was not "a person with knowledge," Fed.R.Evid. 803(6), the exception also applies if the information in the document was "transmitted by[ ] a person with knowledge." LaBoy appears to have attempted to cite as sources of her report those appellees who had first-hand knowledge of the start of the incident, though her testimony seems speculative. (See Tr. 735-36 ("Probably Zemken and probably Doyle. I mean, just guessing off the top of my head, I would say it would be those two.").)
 
 
 89
 In any event, in a retrial, appellees are free to lay, if they can, any proper foundation for admission of the report.
 
 CONCLUSION
 
 90
 We have considered all of appellees' arguments in support of the judgment in their favor and have found those arguments to be without merit. So much of the judgment as dismissed Hynes's claims against appellees and awarded judgment in favor of Zemken on his counterclaim against Hynes is vacated, and the matter is remanded for a new trial of those claims and the counterclaim.
 
 
 91
 Costs to plaintiff.